[Cite as *Connor Group v. Raney*, 2016-Ohio-2959.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

CONNOR GROUP, A REAL ESTATE 　　:
INVESTMENT FIRM, LLC, et al. 　　　:
　　　　　　　　　　　　　　　　　　　　:　　C.A. CASE NO. 26653
　　　Plaintiffs-Appellees 　　　　　　:
　　　　　　　　　　　　　　　　　　　　:　　T.C. NO. 13CV5706
v. 　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:　　(Civil Appeal from
JAMES J. RANEY 　　　　　　　　　　:　　 Common Pleas Court)
　　　　　　　　　　　　　　　　　　　　:
　　　Defendant-Appellant 　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___13th___ day of _____May_____, 2016.

. . . . . . . . . . .

STEPHEN A. WATRING, Atty. Reg. No. 0007761 and MATTHEW J. BAKOTA, Atty. Reg.
No. 0079830, 110 N. Main Street, Suite 1000, Dayton, Ohio 45402
　　　Attorneys for Plaintiffs-Appellees

JEFFREY M. NYE, Atty. Reg. No. 0082247, 2623 Erie Avenue, Cincinnati, Ohio 45208
　　　Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

　　　**{¶ 1}** James J. Raney appeals from a judgment of the Montgomery County Court

of Common Pleas, which granted Connor Group a preliminary injunction against him while

litigation over Raney's alleged defamation and interference with Connor Group's contractual and business relationships continued. Although the issuance of a preliminary injunction by a trial court generally is not viewed as a final appealable order, we ruled earlier in this case that a preliminary injunction that constitutes a prior restraint on speech requires immediate appellate review. *See* Decision and Entry, July 29, 2015, citing *Internatl. Diamond Exchange Jewelers, Inc. v. U.S. Diamond & Gold Jewelers, Inc.*, 70 Ohio App.3d 667, 591 N.E.2d 881 (2d Dist.1991) and *Natl. Socialist Party of America v. Skokie*, 432 U.S. 43, 44, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977).

{¶ 2} For the following reasons, the judgment of the trial court will be reversed.

{¶ 3} The Connor Group, LLC, a real estate investment firm based in Montgomery County, Ohio, manages numerous apartment complexes around the country. Meridian Apartment Manager, LLC, owns Meridian Apartments in Franklin County, Ohio, which is managed by Connor Group. The precise nature of the plaintiff-companies' affiliation is unclear; they will be referred to collectively as "Connor Group." Raney is a former tenant of the Meridian apartment complex.

{¶ 4} In September 2013, Connor Group filed a complaint against Raney for defamation, alleging that, beginning in September 2012, Raney "undertook a campaign to publicly disparage them and to damage their business, trade, and reputation." Raney had allegedly engaged in disseminating disparaging statements about Connor Group to its tenants, prospective tenants, and other business associates. Connor Group claimed that Raney's statements were untrue and/or misleading, that the statements were made with malice and with the intent to damage Connor Group's business and trade, and that the statements had, in fact, damaged its business. In January 2014, Connor Group filed

an Amended Complaint, which added a claim for tortious interference with its contractual and business relationships. Raney filed an answer to the amended complaint denying the new allegations.

{¶ 5} In July 2014, Raney filed a motion for judgment on the pleadings, on the ground that his statements which formed the basis of Connor Group's claims were either true or not defamatory. Raney's motion relied on documents attached to his Amended Answer. Connor Group opposed the motion for judgment on the pleadings. On August 21, 2014, the trial court found that Raney had "utterly failed to comply" with Connor Group's discovery requests, and it granted Connor Group's motion to compel discovery. The trial court also ordered Raney to "cause a forensic image to be made of his computer" within seven days, to prevent the spoliation of evidence.

{¶ 6} On August 27, 2014, while the motion for judgment on the pleadings was still pending, Raney filed a notice of removal to the U.S. District Court for the Southern District of Ohio, based on diversity and the amount in controversy. Pursuant to 28 U.S.C. § 1446(B), a case must be removed to federal court within 30 days of receipt of a complaint or other documents from which a defendant may ascertain that the case is removable. Raney, who sought removal several months after the complaint and amended complaint were filed, claimed that he had just become aware, through responses to interrogatories, that the amount in controversy was over $100,000. Connor Group responded that Raney had been aware of and acknowledged the amount in controversy for many months and was using the removal to delay proceedings in the

common pleas court.[1] The district court found that, by his own admissions, Raney had demonstrated actual knowledge of the amount in controversy "long before" the notice of removal was filed, and that his notice of removal was untimely. The district court remanded the case to the common pleas court on March 2, 2015.

{¶ 7} On March 3, 2015, Connor Group filed a Motion for Temporary Restraining Order and Preliminary Injunction, asking that the court prohibit Raney from directly contacting its employees, tenants, and business associates. It asserted that it was likely to succeed on its claims and that it had no adequate remedy at law for the damage Raney was causing to its business. Raney opposed the motion, arguing that any prior restraint of his speech would violate the First Amendment and that Connor Group was unlikely to succeed on the merits of its claims.

{¶ 8} The trial court scheduled a hearing on the temporary restraining order for March 16, 2015, and a hearing for the preliminary injunction on May 11, 2015. The trial court did not take any action prior to its March 16 hearing to restrain Raney's conduct. The trial court's judgment states that Connor Group provided testimony at the March 16 hearing as to some of Raney's objectionable actions and his motivation, but no transcript of this hearing has been filed. On March 20, the trial court sustained the motion for "temporary restraining order and preliminary injunction"; the trial court's order placed

---

[1] Connor Group filed a Second Amended and Supplemental Complaint in the federal district court on January 26, 2015, after Raney had filed his notice of removal and before the district court remanded the case to the common pleas court. There has been some concern among the parties about whether the common pleas court record reflects the filing of this second amended complaint. We note, however, that the common pleas court filed an entry dated August 14, 2015, in which it deemed the Second Amended and Supplemental Complaint "filed in this Court [the common pleas court] as part of the record in this case as of March 20, 2015."

several specific restrictions on Raney's conduct during the pendency of the case, which are discussed in more detail below. It is this judgment from which Raney now appeals.

**{¶ 9}** We note that a temporary restraining order is issued ex parte, without notice to the other party, and lasts only until a hearing can be held. *Ohio Service Group, Inc., v. Integrated & Open Systems, L.L.C.,* 10th Dist. Franklin No. 06AP-433, 2006-Ohio-6738, ¶ 13, fn. 2, citing *Board of Edn. Ironton City Schools v. Ohio Dept. of Edn.*, 4th Dist. Lawrence No. CA92-39, 1993 WL 256320, * 2 (June 29, 1993). No temporary restraining order was filed in this case. A preliminary injunction is issued after notice and a hearing; it maintains the status quo until a full trial on the merits can be conducted. A permanent injunction is issued after a full trial on the merits. *Id.* The trial court held a hearing and, in the absence of a transcript of that proceedings, we presume that both parties were permitted to provide evidence at that hearing. Thus, the action taken by the trial court in this case is properly characterized as a preliminary injunction.

**{¶ 10}** Raney filed a timely appeal from the trial court's preliminary injunction.

**{¶ 11}** The assignments of error state:

> **The trial court issued an unconstitutional prior restraint when it issued an injunction against defendant-appellant Jim Raney's future speech.**

> **Even if not for the constitutional prohibition against prior restraints, the trial court would have abused its discretion by issuing a preliminary injunction on the facts of this case.**

**{¶ 12}** Although there are two "assignments of Error" and eight "Statements of Related Issues," Raney's central assertion is that the trial court erred in granting a

preliminary injunction under the facts presented, especially insofar as it restrained his right to free speech. Therefore, we will address the assignments and "issues" together.

### *Connor Group's Allegations*

**{¶ 13}** Connor Group's complaint and its motion for a preliminary injunction alleged that Raney was making direct, targeted and harmful contacts with its tenants, investors, and business associates, that these contacts were ongoing and unrelenting, that Raney's statements about Connor Group were untrue or made with reckless disregard for their truthfulness, and that these contacts were causing "disruption and interference with its contractual and business relationships." These allegations were supported by an affidavit from Connor Group's corporate counsel, Samuel E. Dowse, and various exhibits. By way of example, Dowse stated that Raney[2] had done the following:

- Posted signs at Connor Group properties stating "DO NOT RENT HERE";

- Sent postcards picturing scantily-clad female strippers in provocative positions to Connor Group employees at 46 apartment complexes around the country. The postcards stated: "What is the difference between a stripper and an employee of The Connor Group[?] You want the stripper to lie to you for a dollar." The postcards also contained an Internet address with a name similar to Plaintiff's, a website operated by Raney. Raney subsequently acknowledged his responsibility for these postcards on his blog. Connor Group also asserted that the majority of its employees are women and that many employees were "concerned and offended" by the

---

[2] It is not disputed that, in some of his Internet posts, Raney uses the name "John Yossarian," a name which perhaps alludes to the fictional protagonist in Joseph Heller's novel, *Catch-22*.

mailing.

- Interfered with Connor Group's contractual relationship with its own chief executive officer, Larry Connor, by sending a lengthy and disparaging email to the "the entire Homeowners' Association Board" for the community to which Connor and his family recently moved;

- Caused, at least in part, the resignation of an employee of Connor Group in February 2015; the employee reported that Raney's "unrelenting harassment of and malicious comments toward him" played a part in his decision to resign;

- Interfered with Connor Group's business relationship with other employees. For example, one female employee at a Georgia property reported a "scary and super creepy" unwelcome encounter with Raney by email, in which he referenced her child, questioned whether she was being a good role model for the child, and questioned the effect her work with Connor Group was having on other mothers.

- Threatened legal action against a Connor Group employee in Ohio if she did not contact him to discuss Connor Group and its business practices;

- Contacted a current resident of a Connor Group property and engaged him in online communications in which Raney asserted that Connor Group keeps a portion of pest, garbage, and utilities fees paid by tenants for itself, without any benefit to the tenant;

- Contacted partners at an accounting firm with which Connor Group does business, claiming that Connor Group "fed HUD a bunch of bullshit," that

Connor Group's legal problems could become the accountants' legal problems, suggesting that Connor Group engages in "possible illegal or unethical behavior," and advising that the accountants should "conduct [them]selves accordingly";

- Contacted a corporate investor in Connor Group, via the investor's social media site, and stated that residents of one of Connor Group's complexes in Georgia had sued the complex in a class action lawsuit for unsafe and uninhabitable conditions. Raney encouraged the investor to "look into the situation" at the properties that it "own[s] by proxy" and suggested that the investor's values "run counter" to those of Connor Group, which "does not deliver value for the price it extracts from working people";

- Contacted real estate brokers with whom Connor Group contracted to sell one or more of its properties and interfered with those relationships by alleging various problems with the properties and attempted cover-ups by Larry Connor. Raney also directed the real estate brokers to an alleged newspaper article about concerns HUD had raised about the "veracity" of Connor Group's mortgage insurance application and the level of repairs needed at one of its properties, and stated that the sales brochure on a particular property was "way different" than what Raney had read about the property;

- Referenced a buyer investment group associated with the sale of a Connor Group property in his online blog, asserting surprise that the buyer had decided to proceed "despite cracked pool and like deception";

- Contacted vendors, such as caterers of Connor Group events, asking them to "decline doing business with the Connor Group" and asserting the Connor Group has many dissatisfied customers who were willing to go to great lengths to "get satisfaction";

- Contacted current residents of Connor Group properties who posted favorable online reviews of their apartment complexes with information about his online sites disparaging the company, asserting that it was unethical for Connor Group to offer gift cards or rent credits for favorable reviews, and/or asking if the tenant had been offered compensation for a favorable review as part of Connor Group's "program" to inflate its online ratings, and offering that he hopes the tenants' "luck holds out";

- Posted disparaging messages on the Facebook page of a law firm with which Connor Group does business, including crude suggestions that sex acts interfered with the lawyers' abilities to do their jobs.

{¶ 14} Further, Connor Group asserted in its Amended Complaint that, for the purpose of disparaging Connor Group, Raney made untrue statements on websites, social media accounts, and other Internet sources that he accessed or maintained. These statements included, but were not limited to, the following:  Connor Group was "gaming the system" of online apartment ratings; engaged in a practice known as "slamming" by which it changed a consumer's utility provider without notice; engaged in deceptive practices; included illegal clauses in its leases; "piss[ed] down their employees' backs"; did not care about residents; provided poor service; caused residents to fear Connor Group; paid for online reviews; refused to pay for needed repairs while diverting

investor dollars for construction of a corporate headquarters; and "financially raped" residents over many years.

**{¶ 15}** In a supplemental affidavit filed by Dowse in March 2015, Dowse stated that Raney "continued to contact individuals and businesses referenced in the Motion [for an injunction], as well as other organizations in the Dayton area." Specifically, Dowse stated that Raney:

- Contacted a non-profit organization that was partnering with Connor Group on a charity event and threatened harm to the organization's relationships with its investors and performers if it participated in the event with Connor Group;

- Sent messages to realtors with whom Connor Group had a contract and to Larry Connor's homeowners' association "welcoming" them to his lawsuit; the homeowners' association contacted Conner and insisted that he put a stop to these communications;

- Contacted the employee who had cited Raney's actions as a reason for his termination of employment with Connor Group at the employee's new business, made disparaging comments to the employee, and copied the employee's new co-workers on those correspondences.

Dowse concluded that Raney was continuing to contact individuals and companies with whom Connor Group does business and attempting to interfere with or harm those relationships.

### *Raney's Responses*

**{¶ 16}** Raney opposed Connor Group's motion for a preliminary injunction by a

memorandum, which included his own affidavit. The affidavit stated:

- With respect to the stripper postcard, he had not intended to harass anyone and did not even know which individuals would receive the postcards. He also claimed that a "mailbox company" with which he had worked on the postcards was "threatened" by Connor Group's law firm after the fact, even though it had no role in making or mailing the postcards.

- His email to the homeowners' association of Larry Connor's new residence included links to news articles about a town in North Carolina that fined a Connor Group apartment complex for damaging "buffer vegetation" at that apartment complex; he asserted that Connor Group "should be embarrassed about its conduct";

- Regarding the employee who found Raney's references to her child "scary and super creepy," Raney stated that he had only one contact with her, and he stopped contacting her when she requested that he do so, until he responded to a LinkedIn request from someone with the same name almost a year later;

- Raney denied that his contact with other Connor Group employees or with any tenant, as documented by attachments to Dowse's affidavit, was "unwelcome";

- Raney identified a link to a Columbus Dispatch article about the present lawsuit, which was attached to his email to the Connor Group accountants; the article asserts that government records from HUD "describe conditions similar to some of the allegedly defamatory statements Raney made on his

blog and other online forums."

- Raney refers, without documentation, to alleged statements by a judge that there may have been "a disturbing pattern of serious mold, water leaks, and maintenance issues" at a Connor Group property. The affidavit suggests that this is the same property about which Raney had claimed that a class action lawsuit was pending, but Raney did not attach any evidence that such a lawsuit existed or that a judge had made the alleged statements.

- Regarding his alleged contacts with a caterer of Connor Group events, Raney stated that the caterer told him (Raney) that he would not cease doing business with Connor Group, and that Raney stopped contact with the caterer when asked to do so.

- Raney also asserted that he had spoken and acted lawfully about Connor Group and its activities, that he had stopped making Internet posts many months earlier, and that he had not been on any Connor Group property for nine months. Moreover, Raney asserted that his intention was not to harass anyone but to act on his "moral duty to alert people to what I believe is unethical and improper conduct."

### *Issuance of a Preliminary Injunction*

**{¶ 17}** As stated above, the purpose of a preliminary injunction is to preserve the status quo between the parties pending a trial on the merits. A preliminary injunction is an extraordinary remedy; therefore, the moving party has a substantial burden in order to be entitled to the injunction. *KLN Logistics Corp. v. Norton*, 174 Ohio App.3d 712, 2008-Ohio-212, 884 N.E.2d 631, ¶ 11 (8th Dist.), quoting *Sinoff v. Ohio Permanente Med.*

*Group*, 146 Ohio App.3d 732, 740, 767 N.E.2d 1251 (8th Dist.2002). A preliminary injunction "is not available as a right but may be granted by a court if it is necessary to prevent a future wrong that the law cannot." *Garono v. State,* 37 Ohio St.3d 171, 173, 524 N.E.2d 496 (1988) (additional citations omitted); *Mt. Eaton Community Church, Inc. v. Ladrach*, 9th Dist. Wayne No. 07CA0092, 2009-Ohio-77, ¶ 15.

{¶ 18} With respect to a preliminary or temporary injunction, R.C. 2727.02 states:

A temporary order may be granted restraining an act when it appears by the petition that the plaintiff is entitled to the relief demanded, and such relief, or any part of it, consists in restraining the commission or continuance of such act, the commission or continuance of which, during the litigation, would produce great or irreparable injury to the plaintiff, or when, during the litigation, it appears that the defendant is doing, threatens or is about to do, or is procuring or permitting to be done, such act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual.

{¶ 19} To obtain the equitable remedy of a preliminary injunction, a party must show: (1) a substantial likelihood of success on the merits, (2) the existence of irreparable harm if an injunction is not issued, (3) that third-parties will not be unjustifiably harmed if an injunction is issued, and (4) that granting an injunction will serve the public interest. *Procter & Gamble Co. v. Stoneham,* 140 Ohio App.3d 260, 267, 747 N.E.2d 268 (1st Dist. 2000); *Davis v. Widman,* 184 Ohio App.3d 705, 2009-Ohio-5430, 922 N.E.2d 272, ¶ 29 (3d Dist.). *See also* Civ.R. 65(B) and R.C. 2727.02. In determining whether to grant injunctive relief, the factors must be balanced; no one factor is dispositive. *Cleveland v.*

*Cleveland Elec. Illum. Co.,* 115 Ohio App.3d 1, 14, 684 N.E.2d 343 (8th Dist.1996), citing

*Royal Appliance Mfg. Co. v. Hoover Co., Inc.,* 845 F.Supp. 469 (N.D.Ohio 1994). The

four factors must be balanced with the "flexibility which traditionally has characterized the

law of equity." *Id.*, citing *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100,

105 (6th Cir. 1982)

{¶ 20} The party seeking the preliminary injunction must establish each of these

elements by clear and convincing evidence. [3] *Stoneham* at 268; *ITS Fin., L.L.C. v. Gebre*,

2d Dist. Montgomery Nos. 25416, 25492, 2014-Ohio-2205, ¶ 23, citing *Diconix, Inc. v.

Lane,* 54 Ohio App.3d 59, 63, 560 N.E.2d 1319 (4th Dist.1988). "Clear and convincing

evidence is that measure or degree of proof which will produce in the mind of the trier of

facts a firm belief or conviction as to the allegations sought to be established. It is

intermediate, being more than a mere preponderance, but not to the extent of such

certainty as is required beyond a reasonable doubt as in criminal cases. It does not

mean clear and unequivocal." *Id.*, citing *State v. Bluser,* 2d Dist. Montgomery No. 18856,

2002 WL 191567, * 1 (Feb. 8, 2002).

{¶ 21} Irreparable injury or harm, which must be shown for injunctive relief, "is

defined as an injury 'for the redress of which, after its occurrence, there could be no plain,

adequate and complete remedy at law, and for which restitution in specie (money) would

be impossible, difficult or incomplete.' " *Dimension Serv. Corp. v. First Colonial Ins. Co.,*

---

[3] The Ohio Supreme Court has held that, when injunctive relief is authorized by a *statute*, proof of a violation of the statute must only be shown by a preponderance of the evidence. Where the injunction is equitable in nature, as in this case, the elements must be proven by clear and convincing evidence. *See Stoneham*, 140 Ohio App.3d at 267-268, citing *Ackerman v. Tri-City Geriatric & Health Care,* 55 Ohio St.2d 51, 56, 378 N.E.2d 145 (1978) and *State ex rel. Pizza v. Rezcallah*, 84 Ohio St.3d 116, 123, 702 N.E.2d 81 (1998).

10th Dist. Franklin No. 14AP-368, 2014-Ohio-5108, ¶ 12, citing *Union Twp. v. Union Twp. Prof. Firefighters' Local 3412*, 12th Dist. Clermont No. CA99-08-082, 2000 WL 189959 (Feb. 14, 2000) and *Cleveland Elec.* at 12.

{¶ 22} What a plaintiff must show as to the degree of irreparable harm varies inversely with what the plaintiff demonstrates as to its likelihood of success on the merits. *Cleveland Elec.* at 14, citing *Friendship Materials* at 105*; Escape Ent., Ltd. v. Gosh Ent., Inc.*, 10th Dist. Franklin No. 04AP-834, 2005-Ohio-2637, ¶ 48. *See also Roth v. Bank of Commonwealth,* 583 F.2d 527, 538 (6th Cir. 1978). When there is a strong likelihood of success on the merits, preliminary injunctive relief may be justified even though plaintiff's case of irreparable injury may be weak. *Cleveland Elec.* at 14; *Roth* at 538; *Mike McGarry & Sons, Inc. v. Gross*, 8th Dist. Cuyahoga No. 86603, 2006-Ohio-1759, ¶ 19, citing *Blakeman's Valley Office Equip., Inc. v. Bierdeman,* 152 Ohio App.3d 86, 2003-Ohio-1074, 786 N.E.2d 914, ¶ 21 (7th Dist.). Conversely, where the plaintiff's chance of success on the merits of the claim is low, there generally must be a high likelihood of irreparable harm to justify injunctive relief.

{¶ 23} When a preliminary injunction is granted, it must be specific in terms and it must describe in reasonable detail, and not by reference to other documents in the record, the act or acts to be restrained. Civ.R. 65(D). An injunction "is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the order whether by personal service or otherwise." *Id.* The rule requires "specificity, not perfection"; it must allow a defendant to comply "without fear of unwitting violation." *Outback/Buckeye-II, Ltd. Partnership v. Lofino Grandchildren's Trust*, 2d Dist. Greene Nos. 06-CA-2, 06-

CA-44, 2007-Ohio-577, ¶ 68, quoting *Mead Corp. v. Lane*, 54 Ohio App.3d 59, 67, 560 N.E.2d 1319 (4th Dist.1988).

### *Standard of Appellate Review*

**{¶ 24}** A trial court's decision to grant or deny a motion for a preliminary injunction is reviewed on appeal for an abuse of discretion. *Garono*, 37 Ohio St.3d 171, 173, 524 N.E.2d 496. Because a trial court acts within its discretion in framing an injunctive order, it "may act within the latitude implied by that discretion." *Superior Sav. Assn. v. Cleveland Council of Unemployed Workers*, 27 Ohio App.3d 344, 346, 501 N.E.2d 91 (8th Dist.1986), citing *Richmond Hts. v. Bd. of Cty. Commrs.,* 112 Ohio App. 272, 166 N.E.2d 143 (8th Dist.1960). An abuse of discretion implies that the trial courts attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### *The Trial Court's Decision*

**{¶ 25}** Before discussing the trial court's decision in detail, we note that some of the acrimony between Raney and Connor Group unfortunately seeped into the parties' briefs. Comments that the court's order violated "common decency," that "no reasonable person" could have issued the decision the trial court did, that the trial court abdicated its responsibility, and that one side makes "absurdly overbroad arguments" are, somewhat ironically, completely protected by the right to free speech, but do not help either side's position.

### *Substantial Likelihood of Success*

**{¶ 26}** The first element to be considered before ruling on a request for a preliminary injunction is whether there is a substantial likelihood that the party seeking

the injunction will prevail on the merits of the claim. The trial court analyzed this factor in terms of Connor Group's claim for tortious interference with a contractual or business relationship, without mention of the defamation claim.

{¶ 27} There are five elements common to the offenses of tortious interference with a contractual or business relationship: 1) the existence of a valid contract or business relationship between the plaintiff and a third party; 2) the defendant's knowledge of the contractual or business relationship; 3) the defendant's intentional inducement of the third party to breach or terminate the contractual or business relationship; 4) the absence of justification for the defendant's conduct; and 5) damages resulting from the defendant's actions. *Schlaegel v. Howell*, 2015-Ohio-4296, 42 N.E.3d 771, ¶ 31 (2d Dist.), citing *Kademian v. Marger,* 2d Dist. Montgomery No. 24256, 2012-Ohio-962, ¶ 93 and *Wolf v. McCullough-Hyde Memorial Hosp.,* 67 Ohio App.3d 349, 355, 586 N.E.2d 1204 (12th Dist.1990) (discussing tortious interference with a business relationship); *Sacksteder v. Senney*, 2d Dist. Montgomery No. 24993, 2012-Ohio-4452, ¶ 78, citing *Fred Siegel Co., LPA v. Arter & Hadden,* 85 Ohio St.3d 171, 707 N.E.2d 853 (1999), paragraph one of the syllabus (discussing tortious interference with a contract). To prevail on such a claim, the contractual or business relationship must actually be terminated as a result of the defendant's conduct, or a third-party must refuse to enter into a contract or business relationship with the plaintiff as a result of that conduct. *Martin v. Jones,* 2015-Ohio-3168, 41 N.E.3d 123, ¶ 63 (4th Dist.).

{¶ 28} The trial court found that there was no question that business relationships existed between Connor Group and the third parties with whom Raney had been in contact, and that Raney had knowledge of these relationships. Thus, it focused its

analysis on whether Raney had intended to induce a breach or termination of the contractual or business relationships, whether there was any justification for his actions, and Connor Group's evidence of damages.

{¶ 29} With respect to the employee who left his employment with Connor Group after being contacted by Raney, the trial court found that, even assuming Raney's actions caused the employee to terminate his employment, Connor Group had failed to allege any damages that it had suffered as a result of the resignation. The court observed that no contract had existed with this employee. With respect to other business relationships, such as those with other employees, tenants, realtors, and investors, the court noted that Connor Group had alleged arguably improper conduct, but that it had not set forth clear and convincing evidence of actual interference with the business relationships or of damages resulting from the alleged conduct. Based on these conclusions, the trial court found that there was not a "strong likelihood" of Connor Group's success on the merits of its claims.

*Irreparable Harm*

{¶ 30} However, noting that no one element is dispositive in a request for injunctive relief, and notwithstanding its finding that Connor Group's claims did not have a "strong likelihood" of success, the court recognized that matters concerning reputation "can constitute irreparable harm for which there is no adequate remedy at law." Specifically, the court observed that 1) Connor Group had presented evidence that an employee resigned due, in part, to Raney's actions; 2) Raney had asked investors in Connor Group to divest; 3) Raney's only intent was to harm Connor Group, because he was not in competition with Connor Group and had "no legitimate interest in competing

with" it; and 4) Raney's goal was to "shame" Connor Group and thereby damage its reputation beyond repair. The court noted that Connor Group was worried about irreparable harm to its reputation for which there would be no adequate remedy at law.

{¶ 31} The trial court found that Connor Group had presented evidence demonstrating the potential for irreparable harm to its reputation and that Raney's "intentional interferences" with Connor Group's business relationships "may prospectively cause injury by way of a terminated contract or business relationship with damages." Having concluded that Connor Group's likelihood of success was low, we infer that the trial court found that the risk of irreparable harm was high. The court concluded that a preliminary injunction was appropriate to prevent irreparable injury for which there would be no adequate remedy at law and to maintain the status quo while the lawsuit was pending, notwithstanding the absence of substantial evidence that Connor Group would succeed on the merits of its claims.

*Harm to Third Parties and Public Interest*

{¶ 32} Additionally, the trial court found that a "narrowly tailored injunction would not harm third parties" and that the injunction served the public interest, because the "public interest weighs in favor of protecting contracts and business relationships."

{¶ 33} In sum, the trial court had little, if any, doubt that Connor Group had contractual and business relationships of which Raney was aware, and that Raney had tried to induce third parties to breach or terminate their relationships with Connor Group. The court acknowledged that Connor Group had not presented strong evidence in support of its underlying claims for tortious interference with a contractual or business relationship, but found that the nature of the potential harm and the inadequacy of a remedy at law

outweighed the weak likelihood of success. Further, the trial court found no "competitive motivation" or justification for Raney's conduct and that the evidence supported the conclusion that Connor Group could suffer irreparable harm to its reputation.

### The Terms of the Injunction

{¶ 34} The trial court issued a preliminary injunction against Raney which prevented him from directly contacting any of the following businesses or individuals, "with the intent to harass Connor Group" or those businesses or individuals or to cause termination of their contractual or business relationships with Connor Group:

1) Connor Group employees;

2) Connor Group investors, prospective purchasers, and real estate brokers;

3) Current residents of any property managed by Connor Group;

4) Professional services firms including, but not limited to, accountants and law firms, with which Connor Group does business;

5) Vendors with which Connor Group does business;

6) Any other person or entity with which Connor Group has contractual or business relationships.

The trial court did not restrict Raney's ability to maintain his websites or blogs or to otherwise communicate his concerns about Connor Group publicly, including any indirect contacts by those means with the people or groups listed in the preliminary injunction.

### First Amendment Issues

{¶ 35} Notwithstanding its conclusion that Connor Group had a low likelihood of success on the merits of its claims, the trial court found that the preliminary injunction was warranted because of the risk of irreparable harm to Connor Group's reputation and

because it served the public interest by preserving contractual and business relationships. However, the trial court did not directly address the First Amendment implications of its decision, which restricted Raney's future right to free speech to some extent.

**{¶ 36}** Raney has cited *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) and *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir.1996) for the proposition that we must review prior restraints involving free speech de novo. *Bose* was a product disparagement case, the outcome of which turned on a finding of actual malice against the company. The constitutional and factual questions presented therein were entwined with the court's finding of actual malice. *Bose* had nothing to do with prior restraint of speech or a preliminary injunction, and therefore does not stand for the proposition that we must review any preliminary injunction touching on free speech under a de novo standard of review.

**{¶ 37}** The other case on which Raney relies, *Bankers Trust,* dealt with an injunction prohibiting a business magazine from publishing an article disclosing the contents of documents "placed under the seal of secrecy by the parties to a lawsuit."[4] *Bankers Trust* discussed the understandable inclination of a court to grant an emergency restraining order to preserve the status quo as weighed against the media's need to publish news promptly. However, the court held that a restraining order on the release

---

[4] Employing an "unusual" procedure, the parties to that case had agreed to a broad stipulated protective order as part of the discovery process; the order provided that parties and non-parties to the litigation could designate discovery material as "confidential" — without court approval for "good cause" as required by Federal Civil Rule 26(e) — and could have such material filed under seal if the parties agreed that it reflected trade secrets or other confidential research. *Id.* at 222.

of information by a magazine actually "disturbs the status quo" of timely news coverage, "impinges on the exercise of editorial discretion," and constitutes "an immediate and irreversible sanction"; it further held that the trial court could not grant a temporary restraining order "simply in order to give the problem due consideration." *Id.* at 226, discussing *In the Matter of Providence Journal Company*, 820 F.2d 1342 (1st Cir. 1986), *modified on reh'g* by 820 F.2d 1354 (1st Cir.1987). Most of the considerations at issue in *Bankers Trust* are not at issue here.

{¶ 38} *Bankers Trust* and *Bose* do not directly support Raney's argument that we must review a preliminary injunction involving First Amendment questions de novo. They do highlight, however, that "an added layer of complexity" exists where a restraining order or injunction touches upon actions arguably protected by the First Amendment. *Bankers Trust* at 225-226. Where a prior restraint on free speech is involved, "the hurdle is substantially higher" to justify a preliminary injunction; more than the showing of a party's likelihood of success on the merits and/or the threat of irreparable injury must be considered. *Id.* at 226-227. Under such circumstances, the trial court is entitled to less latitude than might normally be extended when we review the issuance of a preliminary injunction for an abuse of discretion.

{¶ 39} The First Amendment protects Raney's right to make derogatory statements about Connor Group, even if they damage Connor Group's reputation (subject, in certain situations, to a claim for defamation). Insofar as the alleged tortious acts committed by Raney involved speech, and the preliminary injunction restrained Raney's ability to speak to various entities and individuals, we must examine the injunction with the "added layer of complexity" presented by the First Amendment.

### *Prior Restraint of Speech*

**{¶ 40}** There is much discussion and disagreement in the parties' briefs about the permissibility of prior restraint of speech through a preliminary injunction, the standard under which such a restraint must be reviewed, whether Raney's actions constitute "speech" entitled to protection under the First Amendment, and whether his statements touch on an issue of public concern. The right to free speech is strongly protected under the law, but some of the free speech issues raised by the parties are of limited relevance where a preliminary injunction is issued in a lawsuit involving two private entities.

**{¶ 41}** A prior restraint of speech occurs when a court or other government entity attempts to prevent speech before it is spoken. Erwin Chemerinsky, *Constitutional Law: Principles and Policies*, 926 (2002). The First Amendment certainly disfavors the prior restraint of speech. Raney asserts that *all* prior restraints on speech of any kind are unconstitutional, and Connor Group disputes this all-encompassing assertion. The cases cited by the parties demonstrate that the degree to which limitations on speech can be imposed varies depending on a variety of factors, including the nature of the restriction, the place and manner of the speech, and whether the speech is addressed to an issue of public concern. Indeed, in weighing the merits of an injunction involving speech, the Supreme Court of Ohio has stated: "[I]t may fairly be said that it is difficult to rescue the principles of law decided from the ocean of words in which they are submerged." *Chucales v. Royalty*, 164 Ohio St. 214, 219, 129 N.E.2d 823 (1955). For this reason, we begin by discussing certain types of cases, cited by one or both of the parties, which we find to be of limited relevance, and why.

**{¶ 42}** The case before us does not involve legislation or governmental regulation

which, by their very nature, apply to a large number of individuals. Generally, restrictions on speech or expression imposed by legislation or regulations are prospective and apply broadly, without consideration of individual circumstances or motivations, and thus are subject to a very high degree of constitutional scrutiny. Such restrictions, however, are "not aimed at the redress of individual or private wrongs," such as those at issue in this case. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 708-709, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

**{¶ 43}** Raney sites cases like *Near* and *R.A.V. v. St. Paul, Minn.*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), as a basis for us to conclude that the trial court's injunction is subject to "strict scrutiny" and is unconstitutional. In *Near,* the state legislature had passed a law "for the abatement, as a public nuisance, of a 'malicious, scandalous and defamatory newspaper, magazine or other periodical.' " *Near*, 283 U.S. at 701-702. A county attorney brought an action under the statute seeking to prohibit publication of articles which charged, "in substance, that a [particular] gangster was in control of gambling, bootlegging, and racketeering in Minneapolis, and that law enforcing officers [including the chief of police and the county attorney] and agencies were not energetically performing their duties." *Id*. at 704.

**{¶ 44}** The United States Supreme Court described the effect of the statute as follows: "[T]he operation and effect of the statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter -- in particular that the matter consists of charges against public officers of official dereliction -- and, unless the owner or publisher is able and disposed to bring competent evidence

to satisfy the judge that the charges are true and are published with good motives and for justifiable ends, his newspaper or periodical is suppressed and further publication is made punishable as a contempt. This is of the essence of censorship." *Id.* at 713. The case discussed the right to free speech and held that the statute was unconstitutional based on freedom of the press.

{¶ 45} In *R.A.V*, the Supreme Court considered St. Paul's "Bias-Motivated Crime Ordinance," which prohibited the display of a symbol which one knows or has reason to know "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *R.A.V.,* 505 U.S. at 379. The ordinance specifically referenced, but did not limit its application to, cross burnings and Nazi swastikas. *Id.* After allegedly burning a cross on a black family's lawn, R.A.V. was charged under the ordinance. The Supreme Court held that the ordinance was an unconstitutional, content-based restraint on expression.

{¶ 46} While *Near* and *R.A.V.* annunciate the general principles and value of free speech, with which we obviously have no disagreement, these cases involved free speech rights that were threatened by the legislative function of government; in their particulars, these cases are neither similar to nor readily analogous to the trial court's action in this case. The trial court's injunction does not restrain the speech of the public, generally, or even a group of individuals; it applies to Raney, and only during the pendency of this case. In other words, Raney's right to free speech has not been restrained in the manner that was at issue in *Near* and *R.A.V.,* and the scope of the constitutional question at issue here is more narrow.

{¶ 47} Raney's communications restricted by the preliminary injunction issued in

this case also do not, as a general matter, involve free speech in any of its "pristine and classic" forms, such as picketing and distribution of literature on the public sidewalk. *See City of Seven Hills v. Aryan Nations*, 76 Ohio St.3d 304, 306, 667 N.E.2d 942 (1996), quoting *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). We recognize that social media postings may be "essentially the electronic successors of the pre-blog, solo complainant holding a poster on the public sidewalk," *Chevaldina v. R.K./FL Mgt., Inc.,* 133 So.3d 1086 (3d Dist. Fla. 2014), but Raney was not enjoined from posting on social media sites or engaging in other, broadly-focused communications.

{¶ 48} In *Seven Hills*, the city sought an injunction banning picketing outside the home of an alleged Nazi war criminal, including the prohibition of "simultaneous expression of contrary views" to "avoid potential for violence." In rejecting such a prohibition, the Supreme Court of Ohio characterized the conduct at issue (picketing) as a "pristine" First Amendment right addressing a "public issue" and occurring in a "public forum." *Id.* at 306. *See also Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (injunction against peaceful picketing/pamphletting of whole city related to business practices exhibiting racial bias held unconstitutional).

{¶ 49} Raney sees his actions as serving the public good by shining a light on what he considers to be mismanagement, misrepresentation, and greed. We agree that he has a right to speak publicly about these issues but, insofar as he has not been restrained from engaging in the more public forms of his communications about Connor Group (e.g., Internet posts and blogging), we cannot conclude that his speech has been restrained with respect to issues of public concern. Insofar as Raney seeks to influence

or disrupt commercial relationships between specific businesses or individuals and Connor Group, we are unpersuaded that his speech is of public concern. In this context, Raney's actions do not "strik[e] at the core of our nation's commitment to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.' " *Seven Hills* at 306*,* citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). To the extent that Raney's communications are aimed at persuading Connor Group's business associates to terminate their business relationships with Connor Group, we do not agree with Raney that these particular communications are of public concern.

{¶ 50} Raney's communications with and about Connor Group employees and business associates are not within the realm of political speech, which has a special place in our jurisprudence. *See United States v. Eichman*, 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990).

{¶ 51} Finally, Raney has essentially admitted that his conduct is commercially motivated; his purpose is to "shame" Connor Group (dubbing himself "Shamer & Defamer" below the signature of some of his correspondence), with an aim to interfere with its business and/or to force Connor Group to modify its business practices. The U.S Supreme Court had stated that commercial speech is that form of communication that does "no more than propose a commercial transaction." *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346, n.24 (1976), quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). *See also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Commission of New York,* 447 U.S. 557,

577, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) ("commercial speech is expression related solely to the economic interests of the speaker and its audience"); *but see* Bernstein and Lee, "Where the Consumer Is the Commodity: The Difficulty with the Current Definition of Commercial Speech," 2013 Mich.St.L.Rev. 29 (2013).  The definition of commercial speech, in the context of this case, logically includes speech that proposes termination or restraint from a commercial transaction.

{¶ 52} Noncommercial speech, on the other hand, includes political speech, speech on public issues, religious speech, and charitable solicitation.  *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *see also* Hirschhorn, *Noncommercial Door-to-Door Solicitation & the Proper Std. of Rev. for Municipal Time, Place, & Manner Restrictions*, 55 Fordham L. Rev. 1139, 1163 (1987).

{¶ 53}  Commercial speech enjoys the protection of the First Amendment. *Virginia State Bd. of Pharmacy,* 425 U.S. at 761-762; *Linmark Assoc., Inc. v. Willingboro,* 431 U.S. 85, 91-92, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977).  The United States Supreme Court has recognized that commercial expression "not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information."  *Central Hudson Gas & Elec. Corp.,* 447 U.S. 557, 561-562, 100 S.Ct. 2343, 65 L.Ed.2d 341. Even when commercial speech communicates "only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all."  *Id.* at 562, citing *Bates v. State Bar of Arizona*, 433 U.S. 350, 374, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

{¶ 54} Nonetheless, the U.S. Supreme Court has recognized "the 'commonsense' distinction" between commercial speech, "which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Central Hudson Gas & Elec.,* 447 U.S. at 563 (addressing utility company advertisements), citing *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455-456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). "The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 562-563.

{¶ 55} Although this case involves the trial court's temporary restraint of commercial speech, rather than a governmental regulation per se, the Supreme Court's distinction between the type of protection afforded commercial speech and that afforded "pristine and classic" speech on a public issue is instructive.

{¶ 56} We conclude that the trial court's preliminary injunction is not subject to strict scrutiny, as Raney contends. Moreover, in the context of litigation in general and of a preliminary injunction in particular, limitations on free speech in general and commercial speech in particular must be viewed differently from limitations imposed in broader contexts.[5] However, these findings do not negate the importance of Raney's right to communicate freely about issues, and even a temporary restraint on speech is improper except in compelling circumstances. We review the trial court's preliminary injunction with these considerations in mind.

---

[5] For an analysis of the historical uses of and justifications for injunctions aimed at expression, the prior restraint doctrine, and content discrimination principles, *see* Wells, *Bringing Structure to the Law of Injunctions Against Expression*, 51 Case W. Res. L. Rev. 1 (2000). *See also* Arent, *A Matter of " 'Governing' Importance": Providing Business Defamation and Product Disparagement Defendants Full First Amendment Protection,* 67 Ind. L.J. 441 (Winter 1992) and Stern, *In Defense of the Imprecise Definition of Commercial Speech,* 58 Md. L. Rev. 55 (1999).

**{¶ 57}** Notably, the trial court's injunction does not, for the most part, encompass those with whom Connor Group has a *potential* business or contractual relationship, with the exception of "prospective purchasers." In our view, the trial court wisely refrained from attempting to prohibit contacts with potential business partners, given the difficulty of identifying such entities with specificity and the requirement that injunctive relief be "specific in terms" and "describe[d] in reasonable detail." Civ.R. 65; *Superior Savings Assoc. v. Cleveland Council of Unemployed Workers*, 27 Ohio App.3d 344, 348, 501 N.E.2d 91 (8th Dist.1986).

**{¶ 58}** The restraint on Raney's communication with those actually doing business with Connor Group – whether as a tenant, employee, or other business partner – is the crux of the preliminary injunction and of this appeal. The trial court recognized in its judgment that Connor Group's likelihood of success on the merits of its claim was low, largely because Connor Group had not set forth clear and convincing evidence of damages or that Raney's actions had actually interfered with its business or contractual relationships. There is little question that Raney intended to provoke the termination of business relationships with Connor Group, but the evidence that he had accomplished this purpose and/or would do so in the future was minimal at best. Numerous business associates had apparently expressed to Connor Group employees their frustration, offense, or bemusement at their interactions with Raney, but there was little evidence of actual, adverse past consequences flowing from his actions or of the potential for such consequences in the future. Even with respect to the employee who left his employment with Connor Group after repeated contacts with Raney, Connor Group alleged only that this was "part" of the reason for the employee's departure.

{¶ 59} Raney maintained that he ceased direct contact with associates of Connor Group when asked to do so. Some of the evidence supports this assertion; other evidence suggests that, where no such request was apparently made, the contacts continued with the same individuals or groups of individuals, such as realtors and accountants. With respect to Connor Group's employee who quit after contacts with Raney, Raney's harassing behavior followed that employee to his next job. Some of the other instances of harassing behavior cited by Connor Group, such as the "strippers" post-card sent to its employees and Raney's contact with an investor online, appear to have been single communications or interactions, not ongoing patterns. There were also repeated contacts with Larry Connor's homeowner's association, but we note that the homeowner's association was not a business relationship of Connor Group.

{¶ 60} Considering the weakness of Connor Group's evidence that it was likely to succeed on the merits of its claims and of its evidence that it had suffered or was likely to suffer any damages (let alone irreparable harm) in the future as a result of Raney's conduct, we conclude that the trial court abused its discretion in finding by clear and convincing evidence that a preliminary injunction was warranted. Connor Group had presented evidence demonstrating its concern about the *potential* for irreparable harm to its reputation, i.e., that Raney's actions "may prospectively cause injury by way of a terminated contract or business relationship with damages," but these concerns were speculative. Moreover, there was no evidence of damage to Connor Group's reputation, generally. While damage to reputation may, in many instances, be difficult to quantify, we are unpersuaded that the damages flowing from the loss of a business relationship in the future (if Raney's efforts were successful) – whether with a tenant, an investor, or a

caterer – would not be quantifiable. In the absence of any evidence of damage to Connor Group's reputation up to that point, of its loss of any business relationship, or of a substantial likelihood of such damage in the future, the "extraordinary remedy" of a preliminary injunction was not appropriate.[6]

{¶ 61} We further note that the trial court enjoined Raney from contacting Connor Group employees or business associates "with the intent to harass Connor Group" or its employees, or business associates, or to cause termination of their business relationships. This remedy intruded on Raney's right to free speech in the future. Under the facts of this case, including Connor Group's weak evidence that it had previously suffered any damages from Raney's conduct, any assumption related to future interference with business relationships and damages was too tenuous and speculative to clear the "high hurdle" to justify the prior restraint of Raney's speech.

{¶ 62} Moreover, the trial court's injunction was not limited to communications aimed at interfering with Connor Group's business relationships. It also prohibited communications intended to "harass" Connor Group, its employees, tenants, or business associates. "Harass" is defined as "to annoy persistently * * * to create an unpleasant or hostile situation * * * by uninvited and unwelcome verbal or physical conduct * * *." Merriam-Webster's Collegiate Dictionary (11th Ed.2005), or as "[w]ords, conduct, or action that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in the person and serves no legitimate purpose". *Black's Law Dictionary* 733 (8th Ed.Rev.2004). The category of communications which might be

---

[6] Nothing in this Opinion should be read as finding that Raney's past or future actions do or do not justify tort claims or that he may or may not be subject to an adverse judgment by Connor Group or other individuals or entities.

construed as having the intent to harass is much broader than communications aimed at interference with a business relationship. In other words, considering the significant weight to be given to Raney's free speech rights, we cannot conclude that the restrictions imposed by the trial court were sufficiently narrow.

{¶ 63} Taking into consideration the trial court's findings that Connor Group did not have a strong likelihood of success on the merits of its claims, that it had presented very limited evidence that it had suffered any damages as a result of Raney's conduct up to this point, that there is little evidence of a potential for irreparable harm, the "extraordinary" nature of any preliminary injunction, and the heightened standard of review in situations that involved a prior restraint on speech, we conclude that the trial court erred in granting the preliminary injunction requested in this case.

{¶ 64} Raney also argues that the trial court abused its discretion in failing to require an injunction bond pursuant to Civ.R. 65(C) and in failing to even address the issue of a bond. Raney acknowledges that some Ohio courts have held that, because Civ.R. 65(C) permits the imposition of a nominal bond, it also implicitly permits a court to order no bond. *See, e.g., Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div.*, 109 Ohio App.3d 786, 793, 673 N.E.2d 182 (10th Dist.1996). He urges this court not to adopt that position, particularly under the facts of this case. However, the case cited by Raney, *Skiles v. Bellevue Hosp.*, 6th Dist. Sandusky No. S-06-002, 2006-Ohio-5361, does not disagree with the holding in *Vanguard* that a court may, within its discretion, impose no bond. *Id.* at ¶ 16. Rather, it holds that "[o]ne cannot be held in contempt for violating a preliminary injunction unless the order has been made operative by posting a bond in an amount fixed by the court." *Id.*, citing *North*

*Electric Co. v. United Steelworkers of America,* 28 Ohio App.2d 253, 257-258, 277 N.E.2d 59 (3rd. Dist.1971). In some circumstances, the posting of a bond may be a prerequisite to a finding of contempt, but we do not necessarily embrace the additional conclusion that a preliminary injunction is "inoperative" or a "nullity" without the posting of a bond in a fixed amount.

{¶ 65} Further, the purpose of a bond is to assure relief to the enjoined party should that party eventually be vindicated. A simple example is a merchant's being enjoined from opening a store that allegedly violates a non-compete agreement and, after a trial, being found not to have been in violation. The merchant's losses during the period of non-operation would be "reimbursed" by the bond of the party which obtained the injunction. But here, Raney did not even allege that he would suffer any adverse financial consequences as a result of his being restrained, and the court could have reasonably determined that a monetary bond was not appropriate.

{¶ 66} Although we may agree with the holding in *Vanguard* that a court may, under some circumstances and within its discretion, require no bond when issuing a preliminary injunction, the court issuing such an injunction should nonetheless address the issue directly. Where the record and the injunction itself are silent, as they are here, we are reluctant to assume that the court considered the issue and deliberately decided to impose no bond. Were we affirming the trial court's judgment imposing a preliminary injunction, perhaps we would remand for the trial court to address the issue of bond. However, in light of our reversal of this judgment, there is no reason for the trial court to address it.

{¶ 67} The related assignments of error are sustained.

**{¶ 68}** The judgment of the trial court will be reversed.

. . . . . . . . . . . .

FAIN, J., concurs.

HALL, J., dissenting:

**{¶ 69}** "A trial Court's decision to grant or deny a motion for a preliminary injunction is reviewed on appeal for an abuse of discretion." Majority opinion at ¶ 24 (Citation omitted). I agree, and I am unable to conclude that the trial court's decision is arbitrary, unreasonable, or unconscionable. Accordingly, I would affirm the judgment of the trial court.

**{¶ 70}** I also do not believe a different standard of review should be used because First Amendment issues are involved. After concluding that case law does not support strict-scrutiny, de novo review of this preliminary injunction, the majority determines that an "added layer of complexity" justifies a heightened examination. Majority opinion at ¶ 38. I disagree. When a cause of action involves a First Amendment issue, that analysis is included in the first injunction consideration, the probability of success on the merits. If the defendant's actions are protected by the First Amendment, the plaintiff's probability of success is lower. Additionally, the communications here admittedly are "commercial speech." I do not believe First Amendment concerns are a free-standing center of analysis.

**{¶ 71}** Even if I may have ruled differently, I view the trial court's decision as a carefully crafted, reasonable order under the circumstances. Moreover, I would conclude that the preliminary injunction was in force because the trial court implicitly determined that no bond was necessary and that Raney did not allege any adverse financial

consequence would result.

. . . . . . . . . . . . .

Copies mailed to:

Stephen A. Watring
Matthew J. Bakota
Jeffrey M. Nye
Hon. Mary Katherine Huffman